1

2

3

4

5

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

6

7

8

9

10

11

12

13

14

15

16

| | |
|---|---|
| SAN JOAQUIN RIVER GROUP AUTHORITY, | 1:11-cv-00725 OWW GSA |
| Plaintiff, | |
| v. | MEMORANDUM DECISION RE CROSS MOTIONS FOR SUMMARY JUDGMENT (DOCS. 58, 73, 77, 80) |
| NATIONAL MARINE FISHERIES SERVICE, | |
| Defendants, | |
| CENTRAL DELTA WATER AGENCY, *et al.*, | |
| Defendant-Intervenors, | |
| PACIFIC COAST FEDERATION OF FISHERMEN'S ASSOCIATIONS, | |
| Defendant-Intervenor. | |

17

## I. INTRODUCTION/BACKGROUND

18

19

20

21

22

23

24

25

26

27

    This suit arises from the United States Pacific Fisheries

Management Council's ("PFMC" or the "Council") April 13, 2011

adoption of commercial troll and recreational fishing management

measures for the waters south of Cape Falcon, Oregon, permitting

commercial and recreational fishing for Sacramento River fall-run

Chinook Salmon ("SRFC") for the 2011 fishing season ("2011 management

measures"), and the National Marine Fisheries Service's ("NMFS") May

4, 2011 approval of the PFMC's recommended 2011 management measures.

Doc. 1.

28

Plaintiff, the San Joaquin River Group Authority ("SJRGA")[1] moves for summary judgment on the following grounds:

(1) That NMFS violated the Administrative Procedure Act ("APA") and the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "MSA") because: (a) the 2011 management measures did not properly account for "known scientific uncertainty and bias in abundance estimates"; and (2) PFMC's decision to end the "overfishing concern" was not supported by the record.  Doc. 59 at 16-20.

(2) That adoption of the 2011 management measures violated the National Environmental Policy Act ("NEPA") because the Environmental Assessment ("EA"): (a) failed to consider whether the 2011 management measures would violate laws or requirements imposed to protect the environment; and (b) failed to consider a reasonable range of alternatives.  *Id*. at 20-23.

(3) That Plaintiff has standing based on two theories of injury: (a) if the 2011 management measures result in less San Joaquin River fall-run Chinook ("SJRFC") escapement, SJRGA member agencies could be

---

[1] The SJRGA is a California Joint Powers Authority duly organized and existing in accordance with the provisions of Sections 6500 *et seq.* of the California Government Code.  The SJRGA is comprised of (a) the Merced Irrigation District ("Merced ID"), Modesto Irrigation District ("Modesto ID"), Oakdale Irrigation District ("OID"), South San Joaquin Irrigation District ("SSJID") and Turlock Irrigation District ("TID"), each of whom is a California irrigation district formed and existing pursuant to the provisions of the California Irrigation District Law (Water Code §§ 20500 *et seq.*); (b) the San Joaquin River Exchange Contractors Water Authority, a California Joint Powers Authority comprised of two mutual water companies, a California irrigation district and a California water district (*see* Water Code §§ 34000 *et seq.*); (c) the Friant Water Authority ("FWA"), a California Joint Powers Authority consisting of 22 public water agencies; and (d) the City and County of San Francisco.  Complaint, Doc. 1, ¶ 5.

subject to future remedial action by the State Water Resources Control Board ("SWRCB") and others "in the form of draconian demands to bypass flows or release water"; and/or (b) that reduced SRFC or SJRFC escapement might lead to SRFC or SJRFC being listed as threatened or endangered under the ESA, which would then subject SJRGA member agencies to ESA regulatory activity. *Id.* at 23-25.

Federal Defendants oppose and cross move for judgment on all the above grounds, and additionally argue that the Doe Defendants should be dismissed as improper parties. Doc. 73-1. Defendant-Intervenor, Pacific Coast Federation of Fishermen's Associations ("PCFFA"), separately cross-moves for judgment on standing and mootness grounds. Doc. 80-1. Defendant-Intervenors, Central Delta Water Agency, South Delta Water Agency (collectively, "Delta Intervenors"), also cross-move on the issue of standing and separately argue that Plaintiff's claims are not ripe. Doc. 77-1.

Plaintiff filed separate oppositions/replies in response to each cross motion. Docs. 84, 87, 89. Federal Defendants and both sets of Defendant-Intervenors replied. Docs. 92, 93, 94.

All motions were submitted for decision September 28, 2011.

## II. <u>STANDARDS OF DECISION</u>

A.   <u>Review Under the APA.</u>

The MSA's judicial review provision specifically provides that a regulation promulgated or action taken under the MSA can only be set aside on a ground specified in APA § 706(2)(A), (B), (C), or (D). 16

U.S.C. § 1855(f)(1)(B).  Because NEPA contains no separate provision for judicial review, compliance with NEPA is also reviewed under the APA.  *Nw. Res. Info. Ctr., Inc. v. NMFS*, 56 F.3d 1060, 1066 (9th Cir. 1995).  Here, Plaintiff alleges NMFS's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Under the APA's "arbitrary and capricious" standard, a court must defer to the agency on matters within the agency's expertise, unless the agency completely failed to address some factor, consideration of which was essential to making an informed decision.  *Nat'l Wildlife Fed'n v. NMFS*, 422 F.3d 782, 798 (9th Cir. 2005) ("*NWF v. NMFS I*").  A court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action."  *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2009):

> In conducting an APA review, the court must determine whether the agency's decision is "founded on a rational connection between the facts found and the choices made ... and whether [the agency] has committed a clear error of judgment."  *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir. 2001).  "The [agency's] action ... need be only a reasonable, not the best or most reasonable, decision."  *Nat'l Wildlife Fed. v. Burford*, 871 F.2d 849, 855 (9th Cir. 1989).

*Id.*

Although deferential, judicial review under the APA is designed to "ensure that the agency considered all of the relevant factors and that its decision contained no clear error of judgment."  *Arizona v. Thomas*, 824 F.2d 745, 748 (9th Cir. 1987) (internal citation and

4

quotation omitted).  "The deference accorded an agency's scientific

or technical expertise is not unlimited." *Brower v. Evans*, 257 F.3d

1058, 1067 (9th Cir. 2001).

> [An agency's decision is] arbitrary and capricious if [it]
> has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect
> of the problem, offered an explanation for its decision
> that runs counter to the evidence before the agency, or is
> so implausible that it could not be ascribed to a
> difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983); *see also Citizens to Preserve Overton Park,*

*Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (reviewing court may overturn

an agency's action as arbitrary and capricious if the agency failed

to consider relevant factors, failed to base its decision on those

factors, and/or made a "clear error of judgment"), *overruled on other*

*grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).

More generally, "[u]nder the APA 'the agency must examine the

relevant data and articulate a satisfactory explanation for its

action including a rational connection between the facts found and

the choice made.'"  *Humane Soc. of U.S. v. Locke*, 626 F.3d 1040, 1048

(9th Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

"The reviewing court should not attempt itself to make up for an

agency's deficiencies:  We may not supply a reasoned basis for the

agency's action that the agency itself has not given."  *Id*.

B.   Summary Judgment.

Summary judgment is appropriate when the pleadings and the

record demonstrate that "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court conducting APA judicial review may not resolve factual questions, but instead determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).  "[I]n a case involving review of a final agency action under the [APA] ... the standard set forth in Rule 56(c) does not apply because of the limited role of a court in reviewing the administrative record."  *Id.* at 89.  In this context, summary judgment becomes the "mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Id.* at 90.

Local Rule 260(e) directs that each motion shall be accompanied by a "Statement of Undisputed Facts" that shall enumerate each of the specific material facts on which the motion is based and cite the particular portions of any document relied upon to establish that fact.  In APA cases, such statements are generally redundant because all relevant facts are contained in the agency's administrative record.  Although no such request was received in this case, requests to dispense with the requirement of filing a statement of facts are routinely granted in this District.

III. **BACKGROUND**

A.   **Magnuson-Stevens Act.**

The Magnuson-Stevens Act was enacted to "conserve and manage the fishery resources found off the coasts of the United States" and "promote domestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. § 1801(b)(1), (3). The MSA recognizes that "[a] national program for the conservation and management of the fishery resources of the United States is necessary to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources." *Id*. at § 1801(6).

The MSA establishes eight regional fishery management councils; the PFMC has authority over the Pacific Ocean fisheries off the coasts of California, Oregon, and Washington. 16 U.S.C. § 1852 (a)(1)(F). The principle responsibility of each Council is to prepare and implement, in accordance with national standards, Fisheries Management Plans ("FMP") designed to "achieve and maintain, on a continuing basis, the optimum yield." from the fisheries under their authority. 16 U.S.C. §§ 1801(b)(4), 1851(a)(1). With regard to the yield from a fishery, the term "optimum," means the amount of fish which:

> (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems;

7

(B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and

(C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

16 U.S.C. § 1802(33).  Councils may also submit regulations deemed "necessary or appropriate" to implement an FMP or to modify existing regulations.  16 U.S.C. § 1853(c).

All FMPs must be consistent with ten national standards prescribed in the Act.  16 U.S.C. § 1851(a).  Relevant here is National Standard One ("NS 1"), which states: "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  *Id.* at § 1851(a)(1).  The Act defines "overfishing" and "overfished" as the "rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield [("MSY")] on a continuing basis."  16 U.S.C. § 1802(34).[2]  MSY is defined as the "largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions and fishery technological characteristics (e.g., gear selectivity), and the

---

[2] The implementing regulations distinguish more clearly between "overfishing" and "overfished."  "Overfishing (to overfish) occurs whenever a stock or stock complex is subjected to a level of fishing mortality or annual total catch that jeopardizes the capacity of a stock or stock complex to produce maximum sustainable yield on a continuing basis."  50 C.F.R. § 600.310(e)(2)(i)(B).  "A stock or stock complex is considered 'overfished' when its <u>biomass</u> has declined below a level that jeopardizes the capacity of the stock or stock complex to produce maximum sustainable yield on a continuing basis."  50 C.F.R. § 610.310(e)(2)(i)(E).

distribution of catch among fleets." 50 C.F.R. § 600.310(e)(i)(A).

If NMFS determines a fishery is overfished, a rebuilding plan is

required within two years. 16 U.S.C. § 1854(e). Fishing may

continue during this period, although interim measures may be

required. *See id*.

B.    The Salmon Fishery Management Process.

     The Pacific Salmon FMP guides management of commercial and

recreational salmon fisheries off the coasts of Washington, Oregon,

and California. AR 298. Implementing the existing FMP, the Council

annually recommends management measures to achieve conservation

objectives for each stock, while simultaneously seeking to fulfill,

to the extent practicable, harvest and allocation objectives that

reflect the Council's social and economic considerations. AR 302.

After a preseason planning process including public participation,

the Council submits the annual management measures to NMFS for review

and promulgation as a regulation. *See* 16 U.S.C. § 1855(d).

     Conservation objectives are fixed measures intended to provide

the guidance during the annual preseason planning process to

establish salmon fishing seasons that achieve optimum yield. AR 305.

Many of the conservation objectives are expressed in terms of annual

fishery escapement numbers, in other words, adults that return to

freshwater to spawn, believed to be optimum for producing MSY over

the long-term. AR 304.

     In the Salmon FMP, "California Central Valley Chinook salmon"

9

include all fall-run, late-fall-run, winter-run, and spring-run stocks of the Sacramento and San Joaquin Rivers and their tributaries.  AR 311. Of these, SRFC are the single largest contributor to ocean fisheries off California, a significant contributor off southern and central Oregon, and present north into British Columbia.  *Id.*  As the major contributing stock to ocean Chinook salmon fisheries off Oregon and California, SRFC serve as the basis for managing the Central Valley Chinook fishery.  *Id.* The bulk of SRFC stocks are south of Point Arena, with considerable overlap with coastal and Klamath River fall Chinook between Point Arena and Horse Mountain.  *Id.*  The FMP sets the conservation objective for SRFC at 122,000-180,000 natural and hatchery adult spawners.  *Id.* Plaintiff does not challenge the conservation objective, which is part of the FMP.

The FMP also sets forth overfishing criteria, recognizing that salmon "abundance can fluctuate dramatically" and "it is not unusual for a healthy and relatively abundant salmon stock to produce occasional spawning escapements which, even with little or no fishing impacts, may be significantly below the long-term average associated" with maximum sustainable yield.  AR 305.  To address the MSA requirement to identify when a stock may be approaching an overfished condition or is overfished, the PFMC established two separate criteria based on a stock's failure to meet its conservation objective.  The first measure, a "conservation alert," is forward-looking and reacts to potential stock declines that might lead to overfishing.  AR 306.  This criterion is triggered during the annual

10

preseason process if a stock is projected to fall short of its conservation objective.  *Id*.  The FMP sets forth the required actions associated with a "conservation alert," which include closing the fishery on that stock for that year.  *Id*.

The second criterion, an "overfishing concern," is based on past history and occurs if, in three consecutive years, the <u>postseason</u> estimates indicate a stock has fallen short of its conservation objective.  AR 307.  When an overfishing concern is triggered, the PFMC will complete an assessment of the stock within one year, that appraises actual level and source of fishing impacts on the stock; considers if excessive fishing has been inadvertently allowed by estimation errors or other factors; identifies any other pertinent factors leading to the overfishing concern; and assesses the overall significance of the present stock depression with regard to achieving MSY on a continuing basis.  AR 307-08.  Depending on its findings, the Council's Salmon Technical Team ("Technical Team" or "STT") will recommend any needed adjustments to annual management measures to assure the conservation objective is met, or recommend adjustments to the conservation objective which may more closely reflect the MSY or ensure rebuilding to that level.  AR 308.  Following its review of the Technical Team report, the Council will specify the actions that will comprise its immediate response for ensuring that the stock's conservation objective is met or a rebuilding plan is properly implemented and any inadvertent excessive fishing within Council

11

jurisdiction is ended.  *Id*.  The criteria for determining the end of an overfishing concern will be included as a part of any rebuilding plan adopted by the Council.  *Id*.

The FMP is periodically amended; the last amendment was passed in 2007.  *E.g.* AR 635.  Plaintiff does not challenge any aspect of the FMP.  During development of the 2011 fishing regulations, the Council engaged in a parallel process of developing a proposed Amendment 16.  Among other things, the proposed amendment includes revisions designed to provide clearer criteria for making "overfishing," "overfished," "approaching overfished," and "rebuilt" determinations.  AR 1051.  Final Council action on the proposed amendment was not scheduled until June 2011.  The Council made clear that 2011 salmon management would be governed by the terms of the current FMP at that time.  AR 1574; *see also* AR 1300.

C.   Management of the Pacific Salmon Fishery in Recent Years.

The SRFC experienced a sudden decline in 2007, with an escapement of 91,374 adults, despite the forecasted escapement of more than 265,000.  AR 4487; AR 869-70.  From 2007 until 2009, SRFC escapements were the lowest ever observed (87,940 spawners in 2007, 64,456 in 2008, and 39,530 in 2009, respectively).  75 Fed. Reg. 24,482, 24,484 (May 5, 2010); AR 870.  The crash has generally been attributed to adverse ocean conditions.  AR 1207, 1212.   However, freshwater conditions and fishery management also played a role.  AR 869-70.

A NMFS workgroup responsible for evaluating the stock collapse found that the Central Valley Index ("CVI") forecasting method used to estimate the 2007 escapement was biased.  *See* AR 870.  For the 2008 season, NMFS developed a new abundance index, the Sacramento Index ("SI"), to replace the CVI.  AR 3834.  The SI was utilized from the 2008 season onwards.  AR 3856.  The SI reflects the sum of (1) SRFC ocean fishery harvest south of Cape Falcon between September 1 and August 31, (2) SRFC impacts from "non-retention ocean fisheries" when they occur, (3) the recreational harvest of SRFC in the Sacramento River Basin, and (4) SRFC adult escapement.  AR 5007.  The SI is forecast annually using a linear regression model.  *Id*.  Along with the estimated value, 95% prediction intervals are calculated.  *See id*.  There is only a 2.5% chance that actual abundance will be less than the low end of the prediction interval and a 2.5% chance that it will be greater than the top end.  The Chinook salmon fisheries south of Cape Falcon were largely closed in 2008 and 2009 in response to low preseason SI abundance forecasts for SRFC.  75 Fed. Reg. 24,482 at 24,484.

For the 2010 season, the SI forecasted an abundance of 245,483 adult SRFC, with the upper bound of the 95% prediction interval at 532,657 and the lower bound at zero.  AR 4796.  In its March 2010 guidance letter, NMFS informed the Council that, because SRFC had not met its conservation objective from 2007 to 2009, it had triggered an "overfishing concern" and would be reported to Congress as

13

"overfished" and that the two-year deadline for a rebuilding plan was triggered.  AR 1052.  NMFS provided guidance that, until a rebuilding plan is implemented, a risk-averse management approach should be adopted, given the recent trend in SRFC adult escapement.  *Id*.  NMFS advised the Council to adopt a conservative approach to management of SRFC in 2010 by structuring potential fisheries to target escapement around the upper end of the SRFC conservation objective range.  *Id*.  The Council adopted measures designed to achieve a projected escapement level of 180,000 SFRC.  AR 4953.  Under the 2010 management measures, California commercial fisheries were heavily constrained, with only eight days open south of Point Arena.  AR 4471.  Escapement failed to meet the 180,000 SRFC objective; only 125,353 hatchery and natural SRFC adults returned to the Sacramento River Basin.  AR 4472.

D.    Development and Adoption of the 2011 Management Measures.

The 2010 fishery showed that a total of 125,353 hatchery and natural area SRFC adults were estimated to have returned to the Sacramento River basin for spawning in 2010, just above the lower bound of the conservation objective.  AR 4472.  Using the SI, the forecasted SRFC adult abundance for 2011 was estimated to be 729,893 adults.  AR 5007.  The upper bound of the 95% prediction interval was estimated to be 1,228,114, and the lower bound estimated to be 231,671.  AR 5007, 5033 (figures).

In the Preseason I report, the Technical Team noted a "concern"

14

about the potential for the SI forecast to be biased high in years when the prior year's returns of two-year old fish (jacks) are weaker.  AR 1569, 4994-95.  Such was the case with the data used to make the 2009, 2010, and 2011 forecast, meaning that the potential for bias was present in 2011.  AR 4995.  The current model over-predicted escapement in two of the three years it has been used.  AR 4796, 5007.  In 2009, the forecast escapement was 3.1 times actual escapement; in 2010 it was 1.6 times actual escapement.  *Id*.  Despite this, the Council's Scientific Statistical Committee ("SSC") endorsed the forecast as the best available science for use in 2011 management.  AR 1184.

The potential for bias in the SI was discussed at the Council's March 4-10, 2011 meeting, with the Council's scientific advisors noting the potential for upward bias and recommending that management measures be crafted accordingly.  AR 1184.  The Council's advisors discussed whether the bias could be quantified and/or corrected, but concluded that, although the bias could be explained, neither quantification nor correction were possible.  AR 1184; 1570 (partial transcription of Council meeting).  The Council requested additional information on the issue, which was provided later that day.  AR 1570-71; AR 808.  The supplemental presentation compared prior SI predictions with the jack cohort strength for those years (i.e., decreasing, similar, or increasing, as was the case in 2011).  AR 809.  While this provided some evidence that the SI forecast could be

15

biased high under the condition of increasing jack escapement, the Council was advised that "the pattern does not suggest that a positive bias in the forecast in 2011 would be a foregone conclusion." *Id*. The Council was also advised that ocean fisheries would likely be constrained due to concern for other stocks as well as NMFS's guidance to target the upper end of the conservation objective, and that these constraints would act as an effective "buffer" to any potential bias in the SI forecast. AR 810. To illustrate this point, it was noted that if the 2011 SI forecast of 729,893 was arbitrarily reduced by one half, and the stock experienced a plausible exploitation rate of 0.50, the projected escapement of SRFC would be approximately 182,000 adults, still exceeding the conservation objective. *Id*.

The 2010 SRFC overfishing concern was also on the Council's agenda for its March meeting. The FMP required the Council to consider the stock assessment on factors causing the overfishing concern, to identify criteria to end the concern, specify actions to ensure the stock's conservation objective was met, and consider any other actions arising from the stock assessment. AR 1195. The Council requested the Technical Team utilize the Lindley (2009) report as a starting point for the stock assessment. *Id*. Doing so, the Council's advisors updated the report with additional data and analyses in order to assess the three broods associated with the 2007-2009 returns. *Id*. The assessment concurred with the Lindley

16

(2009) finding that ocean conditions were the proximate cause of the SRFC collapse, while also noting that problems in the freshwater environment effect survival of fish that migrate through the system. AR 1212.

The report also, alternatively employed the preliminary proposed alternatives from Amendment 16 to evaluate whether SRFC were "overfished" or had been subject to "overfishing."  AR 1212-14. Under the Amendment 16 alternatives, SRFC would not have been declared overfished or subject to overfishing during the same time period.  *Id*.  The report also recommended criteria for ending the overfishing concern, utilizing the preliminary proposed Amendment 16 criteria for finding a stock to be in "rebuilt" status: a three-year geometric mean escapement exceeding 122,000.  AR 1214.  Using this measure, the overfishing concern would be ended with an escapement of 354,412 in 2011.  *Id*.  However, the Council recognized that since they were acting under the current FMP, not including Amendment 16, they should utilize the criteria set forth in the FMP to end an overfishing concern.  AR Audiofile 3/6/11 AM2, 1:28:00-1:31:00.  The Council unanimously decided to use the existing, "default" criteria, which is satisfied when a stock meets its conservation objective, as SRFC did after the 2010 season.  *Id.; see also* AR 1591.

Three management alternatives were proposed for public review at the end of the March meeting.  AR 1366-92, 1394-1422.  The Council then issued the Preseason II report analyzing the three proposed

17

1
2
3
4
5
6
7
8
9

alternatives.  For SRFC, the forecast of 729,893 adults was just slightly lower than the average SI for years 1983-2010.  AR 5202.  As in 2010, NMFS provided guidance that the management alternatives should target an escapement around the upper end of the conservation objective.  AR 651-52.  Predicted SRFC escapements under the three alternatives ranged from 368,700 to 376,800, AR 5235, 5215, 5223, more than double the upper end of the conservation objective, AR 5203.

10
11
12
13
14
15
16
17
18
19
20
21

At the April meeting, the Council took final action on the 2011 management measures.  AR 1606.  It subsequently issued the Preseason III report summarizing the Council's analysis of the adopted measures.  AR 5256.  The adopted measures were predicted to result in an SRFC escapement of 377,000 adults, AR 5271, more than double the target recommended by NMFS (the 180,000 upper end of the conservation objective) and more than three times the lower end of the conservation objective (122,000), see AR 5263.  The adopted measures allow for significantly more fishing opportunity than recent years. AR 5267, 5291-92 (figures).

22

E.    Relevant NEPA Analysis

23
24
25
26
27
28

The three preseason reports also contained the relevant NEPA analysis.  The Preseason I report contained the statement of purpose and need, a summary of the affected environment, and a description and analysis of the No-Action Alternative.  AR 4993.  The No-Action Alternative was assumed to repeat the previous year's management

measures without alteration.  AR 4996.  This alternative would not take into account the current status of salmon stocks and would result in over- or under-harvest of some stocks.  *Id*.  Given the 2011 forecast, a repeat of the 2010 regulations was expected to result in an escapement of 572,600 natural and hatchery adult SRFC, well above the upper end of the conservation objective (180,000).  AR 5058.  The Council concluded that the No-Action Alternative would not meet the purpose and need for the proposed action because it would result in unnecessarily conservative management measures for some stocks, while not satisfying the Endangered Species Act ("ESA") standards for others.  AR 5060.

     The Preseason II report described and analyzed three alternative fishery management measures.  AR 5191; 5198-99.  The three Alternatives proposed various levels of fishing effort for various stocks and areas.  While there were constraints south of Cape Falcon due to other stocks, a relatively high SRFC abundance forecast would allow greater commercial fishing opportunity compared to recent years.  AR 5199.  The recreational fishery alternatives all had a greater minimum size limit in some areas and were proposed to open April 2 and run until mid-September through mid-November, depending on the alternative.  AR 5200.  While the three alternatives were predicted to result in similar SRFC escapements, there were significant differences for other stocks and with respect to the socioeconomic impact on fishermen and associated fishing communities.

*See* AR 5208, 5241-44.  In addition to impacts on target stocks and socioeconomics, the Preseason II report evaluated the impact of the three alternatives on ESA-listed species, other non-target species, habitat, and ecosystem function.  AR 5200-10.  The report concluded that no significant environmental impacts will result from final regulations selected from any of the three alternatives.  AR 5210.

The Preseason III report, analyzing the Council's selected alternative, acted as the NEPA description of the preferred alternative.  AR 5256.  NMFS combined all three of these reports into a single EA with a preface guiding the reader to the relevant NEPA analysis in each, document.  AR 30-31.  In April 2011, NMFS issued a FONSI analyzing each of the CEQ criteria for evaluating the significance of the action.  AR 23.  In addressing the criterion on uncertainty, NMFS found that, while there is some inherent uncertainty involved in projecting stock abundance in a given year, "such uncertainty is addressed through precautionary management measures, and weak stock management which results in lower impacts on healthy stocks which are intermixed with weak stocks in the fishery." AR 26.

F.   <u>NMFS's Approval of the Regulations.</u>

NMFS approved the Council's management measures on April 27, 2011.  AR 14.  The decision memo provided additional information on several issues, including the uncertainty of the SRFC forecast. After noting that the expected SRFC escapement is dependent on other

management constraints, the decision memo states:

> The Council questioned the STT about their comments on forecast bias and whether the bias could be accounted for or otherwise quantified. The STT provided an analysis regarding the question of bias and other indicators related to forecast certainty. In the end, the Council and STT were satisfied that the anticipated escapement of 379,000, twice the upper end of the conservation objective, was sufficient to account for uncertainty and provide confidence that that the conservation objective escapement range would be met.

AR 20-21.

## IV. ANALYSIS

A.   Threshold/Jurisdictional Issues.

    1.   The Council and Doe Defendants.

The Complaint names the Council and Does 1-100 as defendants. Federal Defendants move to dismiss of the Council on the ground that it is not an "agency" within the meaning of the APA.  *See, e.g., Gen. Category Scallop Fishermen v. U.S. Dept. of Commerce*, 635 F.3d 106, 112 n.15 (3d Cir. 2011); *J.H. Miles & Co., Inc. v. Brown*, 910 F. Supp. 1138, 1157-59 (E.D. Va. 1995).  The Doe Defendants have not been identified by name or capacity.  Plaintiff does not object to the dismissal of these parties.  PFMC and the Doe Defendants are all DISMISSED WITH PREJUDICE.

    2.   Standing.

        a.   General Legal Standard.

Standing is a judicially created doctrine that is an essential part of the case-or-controversy requirement of Article III.  *Pritikin v. Dept. of Energy*, 254 F.3d 791, 796 (9th Cir. 2001) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "To satisfy the

Article III case or controversy requirement, a litigant must have suffered some actual injury that can be redressed by a favorable judicial decision." *Iron Arrow Honor Soc. v. Heckler*, 464 U.S. 67, 70 (1983). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

To have standing, a plaintiff must show three elements.

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (internal citations and quotations omitted).

The Supreme Court has described a plaintiff's burden of proving standing at various stages of a case as follows:

> Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at

22

the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id.* at 561; *see also Churchill County v. Babbitt,* 150 F.3d 1072, 1077 (9th Cir. 1998).

b.   Injury-In-Fact and Causation.

Plaintiff first must establish that it has suffered an injury in fact, which *Lujan* defines as "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not 'conjectural or hypothetical.'"  504 U.S. at 560 (internal citations omitted).  The second standing requirement, causation, requires that the injury be "fairly traceable" to the challenged action of the defendant, and not be "the result of the independent action of some third party not before the court."  *Tyler v. Cuomo*, 236 F.3d 1124, 1132 (9th Cir. 2000).  The causation element is lacking where an "injury caused by a third party is too tenuously connected to the acts of the defendant."  *Citizens for Better Forestry v. U.S. Dept. of Agric.*, 341 F.3d 961, 975 (9th Cir. 2003).

(1)   Purported Threat of Additional Obligations to Protect SRFC.

SJRGA's members variously hold riparian and pre-1914 rights of appropriation, water rights permits and licenses issued by the SWRCB, and water service contracts with the U.S. Bureau of Reclamation. Nees Decl., Doc. 63, at ¶ 3; Sweigard Decl., Doc. 65, at ¶ 4; Jacobsma Decl., Doc. 66, at ¶ 5, Knell Decl., Doc. 62, at ¶ 6; Short Decl., Doc. 64, at ¶ 5.  SJRGA member agencies own and/or operate the

23

major non-CVP and non-SWP facilities on the San Joaquin, Stanislaus, Tuolumne, and Merced Rivers.  Westcott Decl., Doc. 61, at ¶ 7.  OID and SSJID hold water rights on the Stanislaus River that are senior to Reclamation's.  Knell Decl., Doc. 62, at ¶ 7.  Since 1988, New Melones has been operated under an agreement that recognizes and satisfies these senior rights.  *Id.*

> (a)   Injury-In-Fact.

Plaintiff does not contend that its members' water rights have already suffered or presently suffer impairment as a result of the 2011 management measures.[3]  Rather, Plaintiff contends the 2011 management measures "threaten" to burden its members' water rights by imposing additional obligations upon them to protect SRFC and, citing *Central Delta Water Agency v. U.S. Bureau of Reclamation*, 306 F.3d 938, 947 (9th Cir. 2002), that such a "possibility of future, threatened injury" can be sufficient to confer standing.  Doc. 59 at 23.

In *Central Delta*, two private owners of farmland adjacent to channels of the Delta sued Reclamation over the agency's planned operation of New Melones Reservoir, which were "highly likely" to

---

[3] Nor does Plaintiff contend that its members' water rights have diminished in economic value.  Rather, SJRGA's argument is that they will at an unknown time in the future be required to put their water rights to instream fisheries uses, to the detriment of its members' interests.  Therefore, Federal Defendants' citation to *Barnum Timber Co. v. EPA*, 633 F.3d 894, 898 (9th Cir 2011), which requires a plaintiff claiming reduction of property value to include "specific, concrete, and particularized" allegations of such diminution at the pleading stage, is not directly on point.  Regardless, under *Lujan*, at the summary judgment stage, Plaintiff must provide concrete and particularized evidence of injury that is causally linked to the challenged action.  504 U.S. at 560-61.

24

cause the salinity of the water plaintiffs used to irrigate their crops to increase.  *Id.* at 947.  There was "little dispute" that changed salinity conditions in waterways adjacent to plaintiffs' farms would be "fairly traceable" to the Bureau's planned operation of New Melones.  The Ninth Circuit concluded that the necessary showing for standing purposes is not that existing salinity standards "had already been exceeded, or that plaintiffs' crops had already been damaged by excessively saline water, but that plaintiffs <u>face</u> <u>significant risk</u> that the crops that they have planted will not survive as a result of the Bureau's decisions" regarding operations of New Melones.  *Id.* at 948.

Applying this standard here, Plaintiff has to establish that it faces "significant risk" that the 2011 fishery management measures will burden its members' water rights.  Plaintiff asserts that "if the 2011 management measures result in less SJRFC[4] escapement, SJRGA members could be subject to remedial action by the [State Water Resources Control Board ("SWRCB")] and others in the form of draconian demands to bypass flows or release stored water, regardless of whether they are responsible."  Doc. 59 at 24.  Such "draconian demands" would, in theory constitute "injury-in-fact," if Plaintiff could demonstrate that they would eventuate.

The Complaint alleges that "Section 3406(b)(1) of the Central

---

[4] Plaintiff shifts between referencing SJRFC, rather than SRFC.  Presumably this is because Plaintiff's members operate on the San Joaquin River, where only SJRFC reside.  The 2011 management measures do not treat the SJRFC separately from the SRFC.

Valley Project Improvement Act ('CVPIA') (Public Law 102–575) directs the Secretary of the Interior to develop and implement a program that makes all reasonable efforts to at least double natural production of anadromous fish in California's Central Valley streams on a long-term, sustainable basis."  Doc. 1 at ¶ 173.  SRFC are such a species. More pertinent to Plaintiff, water quality standards imposed by the SWRCB also contain a "narrative salmon doubling objective," which requires that "[w]ater quality conditions shall be maintained, together with other measures in the watershed, sufficient to maintain a doubling of natural production of Chinook salmon from the average production of 1967–1991, consistent with the provisions of State and federal law."  *SWRCB Cases*, 136 Cal. App. 4th 674, 703 (2006).  To contribute to meeting this narrative salmon protection standard, the SWRCB's Bay-Delta Plan set flow objectives for both the Sacramento and San Joaquin Rivers.  *See id*. at 775-76.

     The SWRCB acknowledged in the 1995 Bay-Delta Plan that there was some "uncertainty" whether implementation of these flow objectives alone would achieve the narrative objective for salmon protection, but nothing obligates the Board to impose additional conditions on any particular schedule, if at all.  *Id*. at 776-77.  "As part of the flow objectives in the 1995 Bay-Delta Plan, the [SWRCB] set minimum monthly average flow rates on the San Joaquin River at Vernalis...."  *Id*. at 702.  Currently, the Vernalis Adaptive Management Plan ("VAMP"), a voluntary arrangement allocating responsibility for

meeting some but not all of the Vernalis flow objectives for a twelve year period to members of the SJRGA, who in exchange would receive $3 million per year from Reclamation and $1 million per year from the California Department of Water Resources ("DWR").  *Id.* at 706-10. The SWRCB "candidly acknowledged" that VAMP might not provide protection for the Chinook "equivalent to that provided by the objectives."  *Id*. at 709.

The SWRCB has determined that additional flow is necessary and issued Draft San Joaquin River Fish and Wildlife Flow Objectives on April 1, 2011.  Pltf's Request for Judicial Notice ("PRJN"), Ex. A, Doc. 60-1.  Bureau of Reclamation comments on the Draft Flow Objectives suggest that their implementation would, in some years, require nearly the entire flow of the Stanislaus, Tuolumne, and Merced Rivers.  PRJN, Ex. C, Doc. 60-3 at 26 (indicating that in critical years, implementing the doubling goal would require 97% of the flow of the Stanislaus, 76% of the Tuolumne, and 86% of the Merced).  Plaintiff has not discussed the likelihood that flow objectives of this nature would actually be imposed.  That they are discussed in the Bureau's comments indicates they have been considered, but this does not establish that Plaintiff faces "significant risk" that they would be adopted and implemented.[5]  This is a failure by Plaintiff to prove the harm of which they complain is

---

[5] Delta Intervenors argue that in order to show that its member's water rights would be impaired by a decline in salmon abundance, SJRGA would "have to show that such water was available for [its members'] use and not otherwise required to be allocated for fishery, other in-stream uses, and downstream senior water rights." Doc. 77-1 at 8.  This is yet another failure of proof by Plaintiff.

1   sufficiently imminent.

2

3                           (b)   Causation.

4       Even if, *arguendo*, the Draft Flow Objectives were likely to

5   impose additional burdens on Plaintiff's members in the near future,

6   Plaintiff has entirely failed to demonstrate that any additional flow

7   prescriptions would be tied to SRFC or SJRFC abundance.   A "chain of

8   causation [may have] more than one link, but [may not be]

9   hypothetical or tenuous...."   *Nat'l Audubon Soc'y v. Davis*, 307 F.3d

10  835, 849 (9th Cir. 2002).   It is Plaintiff's burden to establish by a

11  preponderance of the evidence that its theory of causation is at

12  least "plausib[le]."   *Id.*; *see also Envtl. Def. Ctr. v. EPA*, 344 F.3d

13  832, 867 (9th Cir. 2003) ("A plaintiff who shows that a causal

14  relation is 'probable' has standing, even if the chain cannot be

15  definitively established.").   To successfully establish causation,

16  Plaintiff must demonstrate the "plausibility" of at least two links

17  in the causal chain: (1) that the 2011 management measures will

18  decrease SRFC abundance; and (2) that any such decrease will result

19  in harm in the form of additional burdens upon Plaintiff's members'

20  water rights.   Arguably, the 2011 management measures, which permit

21  certain levels of SRFC harvest, will decrease SRFC escapement below

22  levels that might exist under a different management scheme that

23  permits less harvest.   However, Plaintiff has not demonstrated any

24  link between escapement in 2011 and additional flow burdens.

25      The SWRCB's April 1, 2011 "Notice of Preparation of

26

27

28
                                    28

Environmental Documentation" describes the Draft flow objectives in

general terms.  PRJN, Ex. A, Doc. 60-1.  The Draft revises the

"narrative" water quality objective to call for flows at various

points on the San Joaquin River sufficient to:

> Maintain flow conditions from the San Joaquin River
> Watershed to the Delta at Vernalis, together with other
> reasonably controllable measures in the San Joaquin River
> Watershed sufficient to support and maintain the natural
> production of viable native San Joaquin River watershed
> fish populations migrating through the Delta.
> Specifically, flow conditions shall be maintained, together
> with other reasonably controllable measures in the San
> Joaquin River watershed, sufficient to support a doubling
> of natural production of Chinook salmon from the average
> production of 1967-1991, consistent with the provisions of
> State and federal law.  Flow conditions that reasonably
> contribute toward maintaining viable native migratory San
> Joaquin River fish populations include, but may not be
> limited to, flows that mimic the natural hydrographic
> conditions to which native fish species are adapted,
> including the relative magnitude, duration, timing, and
> spatial extent of flows as they would naturally occur.
> Indicators of viability include abundance, spatial extent
> or distribution, genetic and life history diversity,
> migratory pathways, and productivity.

*Id*. at p. 10 of 21.  This narrative specifically calls for flows that

would "mimic the natural hydrograph," and does not demonstrate any

intent to tie flows to annual escapement data.

Plaintiff cites the Notice of Preparation's Attachment 2, page

1, for the proposition that "[w]hile the proposed objective is based

on a percentage of unimpaired flow, the percentage of flow will be

based on the percentage necessary to double the natural production of

SJRFC."  Doc. 84 at 6.  On this page, the Board states that it has

determined that "more flow of a more natural pattern is needed from

February through June from the San Joaquin River watershed to Vernalis to achieve the narrative San Joaquin River flow objective." PRJN, Ex. A, Doc. 60-1, at p. 10 of 21.  The Board then describes how the numeric flow objectives could look, using a placeholder "X" in lieu of actual flow requirements:

> Thus, the State Water Board has determined that approximately X percent (e.g. 20-60 percent) of unimpaired flow is required from February through June from the Merced, Tuolumne, and Stanislaus Rivers on a X-day average (e.g. 14-day) to a maximum of X cubic-feet per second (cfs) (e.g. 20,000 cfs) at Vernalis, unless otherwise approved by the State Water Board as described below. This flow is in addition to flows in the San Joaquin River from sources other than the Merced, Tuolumne, and Stanislaus Rivers. In addition, the State Water Board has determined that base flows of X cfs (e.g. 1,000 cfs) on a X-day average (e.g. 14-day) is required at Vernalis at all times during the February through June period. Water needed to achieve the base flows at Vernalis should be provided on a generally proportional basis from the Merced, Tuolumne, and Stanislaus Rivers. The actions necessary to meet the above requirements are described below.

*Id*. at p. 12 of 21.  The actual flow parameters will be defined at a later date "based on subsequent analysis."  *Id.*  Nothing in this document defines the magnitude of proposed flow objectives, let alone indicates likelihood that these flow parameters will be tied to annual escapement figures.

Plaintiff cites the Bureau of Reclamation's February 8, 2011 comments to the SWRCB on possible revisions to the Flow Objectives. The Bureau recommends that the SWRCB consider the following "specific goals that would contribute to meeting the overall salmonid doubling goal for the San Joaquin Basin":

Biological Objectives for use as biological metrics:

- To achieve a survival rate of 0.50 for emigrating salmonid smolts in the Delta.
- To achieve survival of emigrating salmonid smolts in each of the tributaries (Stanislaus, Tuolumne and Merced rivers) that result in an average juvenile production rate of 250 emigrating juveniles (measured near the mouth) per adult spawner in each San Joaquin River tributary.
- No delay or blocking of adult salmonids during their upstream migration to the San Joaquin basin and its tributaries due to the effects of water operations (e.g. Stockton Deepwater Ship Channel dissolved oxygen and temperature issues).

Habitat and Flow conditions required to achieve biological objectives

- Provide adequate flows to connect the San Joaquin River and its tributaries to existing floodplains for three months during the February through June period to realize improved productivity of macro invertebrates, increased growth rates of juvenile salmonids, and provide refuge from predators.
- Provide significantly high enough flows to activate geomorphic processes in the San Joaquin River and its tributaries to: mobilize fine sediments, deposit fines in riparian floodplain habitats, and activate natural creation of floodplain habitat.
- Provide flow volumes that contribute to a suitable water temperature regime necessary to maximize survival and growth of incubating eggs, rearing, and migrating salmonids.
- Provide flows to maximize quality (low siltation presence and low armoring of spawning habitat) and provide an appropriate quantity (with low rates of superimposition) of spawning habitat for adult salmonids.

PRJN, Ex. C, Doc. 60-3, at 15-16.  The main focus of these goals is to improve the likelihood that the offspring of any migrating adult will survive to exit the Delta to the ocean.

The Bureau's comments indicate, as logic suggests, that there is some connection between harvest and the measures that will be needed

31

to meet the doubling goal.  The Bureau engaged in preliminary life-cycle modeling exercises to demonstrate to the SWRCB the kinds of analyses it should undertake when setting the Flow Objectives.  These exercises considered harvest as one factor affecting the <u>speed</u> at which improvements in smolt survival would permit achievement of the doubling goal:

> In 2010, there were 62,176 juveniles estimated to have arrived at Mossdale. With that starting population and survival through the Delta of 0.50 (given that tributary survival equals 0.3, there are 2500 eggs per adult, egg to fry survival is 0.333, and 50% of the adults produced are harvested), it would take 9 generations (27 years assuming adults return in year 3) to reach an adult production level of greater than 78,000 (80,442). With a survival rate through the Delta of 0.20 or 0.05 given the same starting population as the previous example, doubling never occurs and instead populations go extinct in 18 and 4 generations (54 and 12 years) respectively, given that all other parameters remain the same.
>
> Survival through the Delta has not been greater than 0.20 since 2001 of coded wire tagged fish used in the VAMP studies (although survival was not measured in 2007 or 2009 and is not yet available for 2010). This illustrates just how dire present conditions are for juvenile salmon migrating through the Delta. To have viable and increasing populations in the San Joaquin basin, this modeling would indicate that survival through the Delta must be greater than 0.20

*Id*. at 19.  Although Reclamation's focus is on improving survival through the delta, these analyses suggest that long-term harvest trends may impact the number of years it will take for freshwater measures to double salmon.

Although there is a connection between harvest rate and the speed at which managers may achieve the salmon doubling goal, this

does not mean there is a connection between the harvest rate in 2011 and the actual flow prescriptions that may be imposed, if and when the SWRCB adopts additional flow objectives.  Plaintiff's assertion of such a connection is contradicted by the fact that all of the documents they cite to demonstrate standing predate the adoption of the 2011 management measures.  The Bureau's Comments were transmitted to the SWRCB in February 2011.  The 2011 management measures were not adopted until April 2011.  There is no plausible connection between this year's management measures and even the most preliminary of projections for any future Flow Objectives.  If anything, the Bureau's comments suggest the results achieved from revised flow objectives may be impacted by a long-term harvest rates.  Notably, Plaintiff has challenged here only the 2011 management measures, the implementation of which will impact a single year's escapement. Plaintiff has not raised a programmatic challenge to the Pacific Salmon FMP or the regulations that guide how harvest is set over longer time horizons.  (Whether NMFS even possesses discretion under the MSA to appreciably modify harvest rates is not discussed by any party.)

     Plaintiff has completely failed to demonstrate that it faces any "significant risk" that additional burdens will be placed upon its members' water rights to protect SRFC or SJRFC, let alone that any such risk is causally linked to the 2011 management measures. Plaintiff has not established injury-in-fact or causation as to its

33

1  "additional flow obligations" theory of standing.

2

3                  (2)   Threat of Listing of SRFC or SJRFC.

4          Alternatively, Plaintiff argues that the 2011 management

5  measures may lead to the future listing of SJRFC as threatened or

6  endangered.  NMFS has already determined that listing of SRFC is

7  unwarranted, because the species is "is not presently in danger of

8  extinction, nor is it likely to become so in the foreseeable future."

9  64 Fed. Reg. 50,394, 50,402 (Sept. 16, 1999).  NMFS reaffirmed this

10 decision five years later.  *See* 69 Fed. Reg. 19,975, 19,997 (Apr. 15,

11 2004).[6]  Plaintiff does not refer to evidence suggesting a change of

12 SRFC's or SJRFC's ESA status is likely.  Whether the 2011 management

13 measures could lead to the listing of SJRFC or SRFC is pure

14 speculation.  *See In re ESA Section 4 Deadline Litig.*, --- F.R.D. ---

15 , 2011 WL 4005349 (D.D.C. 2011) (even where FWS was obligated under

16 settlement agreements with other parties to issue listing

17 determination on various game species by a date certain, hunter

18 plaintiffs could not establish standing based on their theory that

19 the species might eventually be listed, as the settlement agreements

20 did not obligate FWS to reach any particular result and substantive

21 outcome of listing determinations was not before the court).

22

23

24

25

26 _____

27 [6] Plaintiff repeatedly argues that SRFC are listed under the ESA as a "species of
concern."  This designation, which identifies species "about which NMFS has some
concerns regarding status and threats, but for which insufficient information is
available to indicate a need to list the species under the ESA," imposes no legal
obligations, nor indicates imminent listing.  69 Fed. Reg. at 19,975.

28
                                    34

1

2          c.   **Redressability.**

3     Plaintiff bears the burden of proving that it is "likely, as

4  opposed to merely speculative, that the injury will be redressed by a

5  favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envt'l*

6  *Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  Where redress of a

7  plaintiff's harms depends on independent decisions of governmental

8  entities not a party to the pending lawsuit, standing does not exist.

9  *See Lujan*, 504 U.S. at 568-71, (plaintiffs had no standing to

10 challenge regulation interpreting ESA § 7(a)(2) as being limited in

11 geographic scope to projects undertaken in the United States and the

12 high seas; redressability was speculative because agencies funding

13 projects overseas were not parties to the case and maintained the

14 challenged regulation was not binding upon them, therefore requested

15 relief (termination of funding until consultation) was not likely to

16 result from successful lawsuit).  "There is no redressability, and

17 thus no standing, where ... any prospective benefits depend on an

18 independent actor who retains' broad and legitimate discretion the

19 courts cannot presume either to control or to predict.'"  *Glanton ex*

20 *rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123,

21 1125 (9th Cir. 2006) (quoting *ASARCO, Inc. v. Kadish*, 490 U.S. 605,

22 615 (1989)).  In *Glanton*, the "[p]laintiffs claim[ed] that, if their

23 suit [was] successful" in proving that the defendant, a pharmacy

24 benefit manager, charged their health plans too much for prescription

25 drugs, "the plans' drug costs [would] decrease, and that the plans

26

27

28                                35

might then reduce contributions or co-payments." *Id*.  The Ninth Circuit found no standing, explaining that "nothing would force [the health plans] to" pass any savings down to the plaintiffs and that the plans "would be free" to keep the savings for themselves.  *Id*.

This case cannot redress the harm Plaintiff's members would suffer as a result of the SWRCB imposing additional burdens to meet old or new flow objectives, because those flow objectives are not tied to SRFC or SJRFC escapement.

Redress is arguably not a bar for Plaintiff's listing theory of standing.  If escapement in 2011 were likely to cause the listing of SRFC or SJRFC, modifying the 2011 management measures might make listing less likely.  However, Plaintiff has not established this causal link.  The "listing" standing theory is misplaced for other reasons.

> d.   Relaxed Causation and Redressability Standards in Procedural Injury Cases.

Plaintiff's NEPA claims are arguably subject to relaxed causation and redressability standards:

> A showing of procedural injury lessens a plaintiff's burden on the last two prongs of the Article III standing inquiry, causation and redressibility. Plaintiffs alleging procedural injury must show only that they have a procedural right that, if exercised, could protect their concrete interests.

*Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008) (internal citations and quotations omitted).  The reach of this relaxed standard has limits, however, excusing a plaintiff only from the requirement to plead that the procedurally

invalid agency action will, in fact, be modified once the proper

procedures are followed:

> There is this much truth to the assertion that "procedural
> rights" are special: The person who has been accorded a
> procedural right to protect his concrete interests can
> assert that right without meeting all the normal standards
> for redressability and immediacy. Thus, under our case law,
> one living adjacent to the site for proposed construction
> of a federally licensed dam has standing to challenge the
> licensing agency's failure to prepare an environmental
> impact statement, even though he cannot establish with any
> certainty that the statement will cause the license to be
> withheld or altered, and even though the dam will not be
> completed for many years. (That is why we do not rely, in
> the present case, upon the Government's argument that, even
> if the other agencies were obliged to consult with the
> Secretary, they might not have followed his advice.)

*Lujan*, 504 U.S. at 573 n. 7 (1992).

Nothing in the procedural injury standing jurisprudence relaxes

any other aspect of the standing analysis, e.g. that there must be a

causal connection between the government action and the alleged harm.

Plaintiff's tenuous procedural injury theory does not rescue its

standing theories.

e.   Zone of Interest/ Prudential Standing.

In addition to the constitutional requirements of Article III,

courts have developed a set of prudential considerations to limit

standing in federal court to prevent a plaintiff "from adjudicating

'abstract questions of wide public significance' which amount to

'generalized grievances' pervasively shared and most appropriately

addressed in the representative branches." *Valley Forge Christian

College v. Am. United for Separation of Church and State, Inc*., 454

U.S. 464, 474-75 (1982) (quoting *Warth*, 422 U.S. at 499-500).   To

that end, "the plaintiff's complaint must fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Valley Forge*, 454 U.S. at 475 (quoting *Ass'n of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153 (1970)).  In cases arising under the APA, this requirement is particularly important given the limitations of 5 U.S.C. § 702, which "grants standing to a person 'aggrieved by agency action within the meaning of a relevant statute.'" *Ass'n of Data Processing Serv. Orgs.*, 397 U.S. at 153–54 (citing 5 U.S.C. § 702).  The zone-of-interests test is not, however, meant to be especially onerous; rather, it "is intended to 'exclude only those whose interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Nat'l Ass'n of Home Builders v. United States Army Corps of Eng'rs*, 417 F.3d 1272, 1287 (D.C. Cir. 2005) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)),

Federal Defendants and PCFFA maintain that Plaintiff's injuries do not fall within the zone of interest of either the MSA or NEPA.

### (1)   Prudential Standing Under the MSA.

The purpose of the MSA is to "create[] sustainable fisheries for the benefit of fishermen and fishing communities." *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez,* 518 F. Supp. 2d 62, 84 (D.D.C. 2007).  Plaintiffs with economic fishing interests have been found to

38

have prudential standing.  *Id*.  Plaintiff cites *Clarke*, 479 U.S. at 400, for the general proposition that a plaintiff only need show that its interests share a "plausible relationship" to the policies underlying each statute.  Plaintiff claims an indirect interest in seeing the fishery is managed "sustainably."  It contends NMFS is managing the fishery improperly to the detriment of the fisheries' long-term viability.  Although it is a close call, Plaintiff's interest in a sustainable fishery is "plausibly related" to the policies underlying the MSA.  Regardless, Plaintiff's standing theories cannot survive on other grounds.

(2)   Prudential Standing Under NEPA.

Defendants also maintain that Plaintiff lacks prudential standing under NEPA.  PCFFA cites *Nevada Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713 (9th Cir. 1993), in which rancher plaintiffs challenged the Forest Service's issuance of a Land and Resource Management Plan ("LRMP"), asserting that the LRMP would result in drastically reduced grazing levels.  *Id*. at 715.  Among other claims, plaintiff challenged the Forest Service's compliance with NEPA.  The Ninth Circuit found that plaintiffs lacked prudential standing to bring their NEPA claim, because "[t]he purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions ... Therefore a plaintiff who asserts purely economic injuries does not have standing to challenge an agency action under NEPA."  *Id*. at 716.  Plaintiffs specifically

39

argued that in addition to economic injury, the LRMP also affected the "human environment" by causing a "lifestyle loss." *Id*. The Ninth Circuit rejected this argument, reasoning that plaintiffs could not invoke NEPA to prevent a "lifestyle loss" when "the lifestyle in question is damaging to the environment," and where plaintiff's suit is "more likely to frustrate than to further" the objectives of NEPA. *Id*.

Unlike *Nevada Land Action,* Plaintiff asserts that it has a direct interest in an environmental value, the sustainability of the SRFC fishery (and the arguably related abundance of SJRFC), "which occupy rivers and streams where SJRGA member agencies have rights to water...." Doc. 84 at 8.  That Plaintiff and its members hold this interest for largely economic reasons, rather than purely aesthetic or environmental ones, does not transform that interest from a permissible environmental interest into an impermissible economic one.  *See Lujan*, 504 U.S. at 582 ("[W]e have no license to demean the importance of the interest that particular individuals may have in observing any species or its habitat, whether those individuals are motivated by esthetic enjoyment, an interest in professional research, or an economic interest in preservation of the species"). Protecting SRFC and/or SJRFC is a goal that is compatible with NEPA. The zone of interest test does not bar Plaintiff's standing to bring its NEPA claim.  Regardless, Plaintiff's standing theories fail on other grounds.

1

2       Federal Defendants and Defendant-Internvenors' motions for

3  summary judgment that Plaintiff lacks standing are GRANTED;

4  Plaintiff's cross motion is DENIED.  Plaintiff has not demonstrated

5  it is likely that the challenged action will cause any harm to its

6  member's water rights.

7

8       3.    Mootness.

9       An issue is moot "when the issues presented are no longer 'live'

10  or the parties lack a legally cognizable interest in the outcome."

11  *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).  If the parties

12  cannot obtain any effective relief, any opinion about the legality of

13  a challenged action is advisory.  *Id*.  "Mootness has been described

14  as the doctrine of standing set in a time frame: The requisite

15  personal interest that must exist at the commencement of the

16  litigation (standing) must continue throughout its existence

17  (mootness)."  *Arizonans for Official English v. Arizona*, 520 U.S. 43,

18  68 n.22 (1997) (citation and quotation omitted).  "[A]n actual

19  controversy must be extant at all stages of review, not merely at the

20  time the complaint is filed."  *Id*. at 67.

21

22       PCFFA argues that Plaintiff's claims are moot because "[t]he

23  season is quickly coming to a close."  Doc. 80-1 at 9.  Their

24  argument continues:

25

26           All commercial fishing off the coast of California
            terminates on September 30, with the exception of a 12-day
27           fishery off Point San Pedro in early October.  AR 5275.
            All commercial fishing off the coast of Washington State

28
                                    41

terminates on September 15, and fishing off the coast of
Oregon terminates on August 31 excepting waters between
Cape Falcon and Humbug Mountain, which reopen during the
month of October.  *Id.*   The recreational fisheries south of
Pigeon Point, California end on September 18; the other
recreational fisheries off the coasts of Washington,
California and California north of Pigeon Point close
between September 5 and October 30.   No commercial or
recreational fishing is permitted after October 31.   Id.

Thus, the majority of plaintiff's claims will be moot by
the time this Court hears this matter on September 28, and
the balance will become moot shortly thereafter.   Id.   Even
as to any fishing seasons which have not yet closed as of
the date of this Court's hearing on plaintiff's summary
judgment motion, as a practical matter, given the heavy
investment of the commercial and recreational fishing
industries in reliance on the fishing seasons recommended
by the PFMC last April and approved by NMFS on May 4, 2011,
it is far too late in the season for plaintiff to secure
any effective relief for its alleged grievances.

Doc. 80-1 at 9-10.

The fact that "the majority" of the fishing season will be over
by the time these cross-motions are heard necessarily means that some
aspects of the fishing season will continue past the hearing date.  A
rapid ruling from the court in Plaintiff's favor could be followed by
the issuance of remedial injunctive relief.   Imminent mootness is not
the same as mootness.[7]  PCFFA's motion for summary judgment that
Plaintiff's claims are moot is DENIED WITHOUT PREJUDICE.

It is not necessary to evaluate Plaintiff's alternative argument
that its claims are not moot because they are capable of repetition

---

[7] Notably, the MSA absolutely precludes preliminary injunctive relief.  16 U.S.C. §
1855(f)(1)(A); *Turtle Island Rest. Network v. U.S. Dept. of Commerce*, 438 F.3d 937,
943 (9th Cir. 2006).   Plaintiff can only petition the court to assign the matter
for hearing at the earliest possible date and expedite the matter in every possible
way.  16 U.S.C. § 1855(f)(4).   The parties did not seek further expedition of the
hearing, although the Court was available.

1    yet evading review.

2
3         4.    Ripeness.

4         The Delta Intervenors assert that SJRGA's claims are not ripe,

5    because Plaintiff fails to show any "actual damage to any of its

6    members that has been caused by the management measures or a decline

7    in salmon abundance, or that any injury is imminent."  Doc. 77-1 at

8    7.  Delta Intervenors cite *American Council on Education v. FCC*, 451

9    F.3d 226, 236 (D.C. Cir. 2006), which held that "a speculative fear

10   about possible future agency action does not present a case or

11   controversy ripe for judicial review."  But, *American Council*

12   concerned whether a challenge could be brought against a "possible

13   future" action by the FCC.  Here, the agency action complained of,

14   the 2011 management measures, have already been adopted.  Whether the

15
16   harms claimed by Plaintiff are imminent goes to standing, not

17   ripeness.  Delta Intervenors' motion for summary judgment that

18   Plaintiff's claims are unripe is DENIED.

19
20   B.   Magnuson-Stevens Act Claims.

21        1.   Assessment of SRFC's Status.

22        Although Plaintiff does not raise a relevant legal claim, the

23   parties raise a debate over the health of the SRFC population.

24   Plaintiff claims that SRFC have experienced a "consistent population

25   decline" and a "recent and unprecedented population crash."  Doc. 59 at

26   17.  Uncontradicted evidence shows that prior to 2007, SRFC failed to

27   meet its conservation objective in only five of the prior 26 years,

28
                                   43

surpassing the high end of the conservation objective in 18 of those years.  AR 4493.  Federal Defendants concede that the population numbers in 2007, 2008, and 2009 were cause for concern, but emphasize that the population rebounded in 2010 and that this type of fluctuation is not unprecedented.  For example, from 1990 through 1992, SRFC also failed to exceed the low end of the conservation objective range three years in a row, yet rebounded in the following year and then experienced an 11-year period of record high escapements.  AR 4487.  Plaintiff rejoins that during the 2007-2009 crash, abundance fell faster than at any time in the historical record and ranked among three of the four worst escapement years ever recorded, with 2008 and 2009 being the worst.  AR 5014.  Deference is owed to the agency's expert analysis of the status of the species. *PCFFA v. Sec'y of Commerce*, 494 F. Supp. 626, 634 (N.D. Cal. 1980). Plaintiff has pointed to no record evidence establishing that the agency's description of the SRFC's status was unreasonable or erroneous.

Plaintiff rejoins: "even meeting the conservation objective does not necessarily indicate whether Fall Chinook abundance is stable in a manner consistent with state and federal law, which seek to protect and restore natural stocks."  Doc. 84 at 2. Plaintiff contends Federal Defendants ignored the detrimental effects of hatchery stocks, "whether natural stocks are declining and specifically whether natural SJRFC are declining," and that "simply looking at

whether the conservation objective was met is irrelevant."  *Id*. at 3.
These arguments, not included in Plaintiff's initial motion and
raised for the first time in opposition/reply, fail to acknowledge
that the challenge the conservation objective, which is not
challenged, is 122,000 – 180,000 <u>natural and hatchery</u> adult spawners.

Plaintiff again emphasizes that NMFS "identified Fall Chinook as
a candidate for listing" to suggest the population is in trouble.
Plaintiff also misleadingly suggests that "if it is now the position
of the United States that Fall Chinook are doing fine, SJRGA looks
forward to NMFS 'de-listing' Fall Chinook."  Doc. 84 at 1.  But,
designation as a "species of concern" is not synonymous with being
"listed," nor does Plaintiff cite any evidence demonstrating that the
species is likely to be listed.  To the contrary, NMFS has twice
determined that listing is not warranted.  64 Fed. Reg. at 50,402; 69
Fed. Reg. at 19,997.  Neither the SRFC as a whole or the SJRFC are
listed under the ESA.  The MSA mandates that NMFS permit harvest
(i.e., maintain optimum yield) for commercial stocks such as SRFC.
16 U.S.C. §§ 1801(b)(4), 1851(a)(1).  This is what NMFS has done.

   2.   <u>Consistency with National Standard 1; Consideration of
        Scientific Uncertainty and Bias.</u>

Plaintiff's first substantive claim is that the 2011 management
measures are inconsistent with NS 1, which requires that conservation
and management measures prevent overfishing while achieving, on a
continuing basis, the optimum yield from each fishery.  16 U.S.C. §
1851(a).  The regulatory guidelines implementing NS 1 also require

that management actions become more conservative as biomass estimates decline and as scientific and management uncertainty increases.  50 C.F.R. § 600.310(f)(1).  Plaintiff contends that "despite upward bias, scientific uncertainty, a consistent population decline, a recent and unprecedented population crash, and a consistent history of over-predicting escapement, PFMC arbitrarily adopted management measures it knew would result in fewer fish."  Doc. 59 at 17.

It is undisputed that the SSC, STT, and Preseason Report I all voiced concern as to scientific uncertainty and upward bias in the forecast.  AR 1184, 1296, 1572, 3/6/11 am One 14:55.  Plaintiff also contends that the model had a "history of over-predicting escapement; significantly over-predicting escapement two of the three times it had so far been used."  Doc. 59 at 17 (citing AR 4998, 5007, 5014). Defendants do not deny that the SI model over-predicted escapement in those two years.  However, the Council thoroughly considered the issues of scientific uncertainty and upward bias.  At the March 4-10, 2011 meeting, the Council's scientific advisors noted the potential for upward bias and recommended that management measures be formulated to address it.  AR 1184.  The Council's advisors considered whether the bias could be quantified and/or corrected, but concluded that neither quantification nor correction was possible. AR 1184; 1570 (partial transcription of Council meeting).  The Council requested additional information on the issue, and a supplemental presentation provided some evidence that the SI forecast

could be biased high under the condition of increasing jack escapement.  The Council was advised that "the pattern does not suggest that a positive bias in the forecast in 2011 would be a foregone conclusion," AR 809, however, because ocean fisheries will likely be constrained due to concern for other stocks, and NMFS guidance was to target the upper end of the conservation objective, these constraints effectively act as a "buffer" to any potential bias in the SI forecast, AR 810.  Plaintiff points to no record evidence or expert testimony suggesting this conclusion is clearly erroneous, nor to any facts the Council did not consider in its deliberations about recognizing, analyzing, and implementing measures to address upward bias in the fish population estimates.[8]

Plaintiff cites transcripts from and documents presented during public hearings that led to adoption of the management measures to demonstrate that that biological and environmental factors indicated that actual abundance could be even lower in 2011 than in 2010, when escapement was only 152,857 fish.  AR 1676; 3/6/11 am Two 1:09. These citations are to comments made by Plaintiff at the hearing highlighting (1) that "parental abundance" was lower for the 2011 cohort than for the 2010 cohort and (2) that ocean conditions were

---

[8] Plaintiff forecasts the potential consequences of an upward bias in the SI estimate.  For example, if actual abundance turned out to be on the low end of the 95% confidence interval predicted by the SI estimate (231,671), a harvest at a 50% exploitation rate would produce a post-season escapement of 115,835 (AR 1572, 3/6/11 am Two 53:30), which would, according to Plaintiff, trigger a conservation alert and a fishery closure.  *See* Doc. 59 at 18.  This establishes that the potential consequences of an over-estimate are serious.  The Council considered and adjusted for bias and uncertainty.  Where the agency considers and reasonably explains the basis for its decision, the law does not require more.

less favorable in 2011 than in 2010.  *Id.*  The transcript indicates that, according to Plaintiff's presenter, these considerations could result abundance below 152,857, which is below the low end of the SI estimate's 95% confidence interval.  Plaintiff's parental abundance theory is also explained in a written comment letter.  AR 1621.

Although it appears that the parental abundance figures, taken from the widely-accepted grand tab surveys, are accurate, Plaintiff cites no scientific authority for its contention that parental abundance is dispositive of overall abundance estimates.  At oral argument, Plaintiff conceded that the SI index <u>was</u> the best available science and has made no attempt to undermine the Council's reliance upon it.

In addition, Plaintiff's assertion that ocean conditions were worse appears to be based upon data from the Northwest Fisheries Science Center taken out of context.  The letter, AR 1623, cites a Northwest Fisheries Science Center website[9], which indicates the cited data concerns "indicators of the Northern California Current." The homepage for this entire section of the NFSC website[10] explains that the data on the entire website, of which the referenced website is a part, pertains to "growth and survival of juvenile salmon in the northern California Current off <u>Oregon and Washington</u>."  (Emphasis added).  It is undisputed that the bulk of SRFC stocks are south of

---

[9]  *See* http://www.nwfsc.noaa.gov/research/divisions/fed/oeip/g-forecast.cfm (last visited Sept. 29, 2011).
[10]  *See* http://www.nwfsc.noaa.gov/research/divisions/fed/oeip/a-ecinhome.cfm (last visited Sept. 29, 2011).

Point Arena, California.  AR 311.  Plaintiff's reliance on this data to demonstrate trends in SRFC abundance is unpersuasive and misplaced.

Plaintiff emphasizes a hypothetical example provided by Council advisors.  The advisors noted that if the 2011 SI forecast of 729,893 was "arbitrarily" reduced by one half, and the stock experienced a plausible exploitation rate of 50%, the projected escapement of SRFC would be approximately 182,000 adults, which still exceeds the conservation objective.  AR 1572.  This hypothetical situation was discussed for illustrative purposes.  The use of the word "arbitrary" in the administrative record does not mean that the agency's decision was, in fact, arbitrary.  Rather, this reflects an effort at transparency, by recognizing that the illustration "arbitrarily" chose the one-half reduction.

Even assuming, *arguendo*, Plaintiff has standing, its motion for summary judgment that Federal Defendants violated the MSA and APA by failing to adequately consider bias and uncertainty is DENIED; Federal Defendants' cross motion is GRANTED.

3.   PFMC's Decision to End the "Overfishing" Concern.

Plaintiff's opening brief argued that PFMC's decision to end the overfishing concern was arbitrary and capricious, because PFMC had "discretion to decide" what criteria to use to determine whether the overfishing concern should be terminated, but "blindly" close to apply the "default," existing criteria, rather than the criteria set

49

forth in Amendment 16.  Doc. 59.  PFMC's decision was not "blind."

Plaintiff admits that NMFS had not yet adopted the <u>proposed</u> Amendment

16.  Pltfs' Stmt. of Facts, Doc. 67, ¶¶ 224-226.  PFMC determined it

would be inappropriate to apply an unadopted standard.  Regardless,

although the PFMC recommended ending the overfishing concern, NMFS

has not yet acted on that recommendation.  *See* Fed. Def. Cross-Mot.,

Doc. 73-1 at 22.  Correspondingly, the stock is still reported and

treated as "overfished."  Plaintiff's challenge is without merit and

is arguably unripe.  Plaintiff did not address this issue in its

opposition/reply brief.

Even assuming, *arguendo*, Plaintiff has standing, its motion for

summary judgment that Federal Defendants violated the MSA and APA by

ending the overfishing concern is DENIED; Federal Defendants' cross

motion is GRANTED.

C.   <u>National Environmental Policy Act Claims.</u>

1.   <u>Legal Framework.</u>

NEPA requires all federal agencies to prepare an environmental

impact statement ("EIS") to evaluate the potential environmental

consequences of any proposed "major Federal action[] significantly

affecting the quality of the human environment."  42 U.S.C. §

4332(C).  The preparation of an EIS serves a number of purposes:

> It ensures that the agency, in reaching its decision, will
> have available, and will carefully consider, detailed
> information concerning significant environmental impacts;
> it also guarantees that the relevant information will be
> made available to the larger audience that may also play a
> role in both the decisionmaking process and the
> implementation of that decision.

50

> Simply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.  Moreover, the strong precatory language of § 101 of the Act and the requirement that agencies prepare detailed impact statements inevitably bring pressure to bear on agencies to respond to the needs of environmental quality.  115 Cong. Rec. 40425 (1969) (remarks of Sen. Muskie).
>
> Publication of an EIS, both in draft and final form, also serves a larger informational role. It gives the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provides a springboard for public comment.

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (internal citations and quotations omitted).  "NEPA does not contain substantive requirements that dictate a particular result; instead, NEPA is aimed at ensuring agencies make informed decisions and contemplate the environmental impacts of their actions." *Ocean Mammal Inst. v. Gates*, 546 F. Supp. 2d 960, 971 (D. Hi. 2008) (quoting *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)).  "NEPA emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Ctr. for Biological Diversity v. U.S. Forest Service*, 349 F.3d 1157, 1166 (9th Cir. 2003) (internal citation and quotations omitted).

Federal regulations implementing NEPA define major federal action:

51

1      Major Federal action includes actions with effects that may
       be major and which are potentially subject to Federal
2      control and responsibility. Major reinforces but does not
       have a meaning independent of significantly ([40 C.F.R.] §
3      1508.27). Actions include the circumstance where the
       responsible officials fail to act and that failure to act
4      is reviewable by courts or administrative tribunals under
       the Administrative Procedure Act or other applicable law as
5      agency action.

6      (a) Actions include new and continuing activities,
       including projects and programs entirely or partly
7      financed, assisted, conducted, regulated, or approved by
       federal agencies; new or revised agency rules, regulations,
8      plans, policies, or procedures (§§ 1506.8, 1508.17). Actions do not include funding
9      assistance solely in the form of general revenue sharing
       funds, distributed under the State and Local Fiscal
10     Assistance Act of 1972, 31 U.S.C. 1221 et seq., with no
       Federal agency control over the subsequent use of such
11     funds. Actions do not include bringing judicial or
       administrative civil or criminal enforcement actions.

12
       (b) Federal actions tend to fall within one of the
13     following categories:

14     (1) Adoption of official policy, such as rules,
       regulations, and interpretations adopted pursuant to
15     the Administrative Procedure Act, 5 U.S.C. 551 et
       seq.; treaties and international conventions or
16     agreements; formal documents establishing an agency's
       policies which will result in or substantially alter
17     agency programs.

18     (2) Adoption of formal plans, such as official
       documents prepared or approved by federal agencies
19     which guide or prescribe alternative uses of Federal
       resources, upon which future agency actions will be
20     based.

21     (3) Adoption of programs, such as a group of concerted
       actions to implement a specific policy or plan;
22     systematic and connected agency decisions allocating
       agency resources to implement a specific statutory
23     program or executive directive.

24     (4) Approval of specific projects, such as
       construction or management activities located in a
25     defined geographic area. Projects include actions
       approved by permit or other regulatory decision as
26     well as federal and federally assisted activities.

27   40 C.F.R. § 1508.18.

28
                                    52

When an agency takes major federal, the agency must prepare an EIS "where there are substantial questions about whether a project may cause significant degradation of the human environment." *Native Ecosystems*, 428 F.3d at 1239. An agency may choose to prepare an EA to determine whether an EIS is needed. 40 C.F.R. §§ 1501.4, 1508.9(b). The EA must identify all reasonably foreseeable impacts, analyze their significance, and address alternatives. 40 C.F.R. §§ 1508.8, 1508.9, 1508.27. If, based on the EA, the agency concludes that the proposed actions will not significantly affect the environment, it may issue a Finding of No Significant Impact ("FONSI") and forego completion of an EIS. *See Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1225 (9th Cir. 1988); 40 C.F.R. § 1501.4(e).

Whether an action may significantly affect the environment "requires consideration of context and intensity." *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir. 2008)(citing 40 C.F.R. § 1508.27). "Context delimits the scope of the agency's action, including the interests affected." *Id*. (quoting *Nat'l. Parks & Conservation Ass'n v. Babbit*, 241 F.3d 722, 731 (9th Cir. 2001)). Among other factors, an action's intensity depends on whether it threatens to violate Federal, State or local law, or requirements imposed to protect the environment. 40 C.F.R. § 1508.27(b)(10).

//

//

2.   <u>Do the 2011 Management Measures Threaten to Violate</u>
<u>Federal, State, or Local Laws, or Other Requirements</u>
<u>Imposed to Protect the Environment?</u>

The EA for the 2011 management measures concluded that the measures would not significantly impact the quality of the human environment.  AR 27.  Plaintiff argues that that Preseason Report II, which includes the NEPA analysis for the 2011 management measures, did not even analyze whether the measures would violate any Federal, State, or local law or requirement imposed to protect the environment.  *See* AR 5200-5210.  Specifically, Plaintiff complains that PFMC ignored whether greater flow would be required to offset the impacts of greater harvest and/or of overfishing.  Doc. 59 at 22.  Plaintiff argues that "[b]y ignoring efforts to double natural production of Fall Chinook, NMFS and PFMC failed to take a 'hard look' at how ocean harvest following the recent, severe Fall Chinook population crash, would impact efforts to double the natural production of SJRFC."  *Id.*[11]

This argument fails for a straightforward reason: Plaintiff has pointed to no enforceable standards that would be "violated" by the 2011 management measures.  The SWRCB has implemented flow objectives to help achieve the state's narrative salmon doubling goal, but Plaintiff does not contend, as it cannot, that the 2011 management measures "violate" these flow objectives.

_____

[11] The Programmatic EIS for Pacific Salmon Fisheries Management off the Coasts of Southeast Alaska, Washington, Oregon, and California, and in the Columbia River Basin, acknowledges the existence of the CVPIA's doubling goal as a measure to "reverse trends in the decline of salmon," but does not discuss the interplay between ocean harvest and freshwater management.  AR 2352.

Plaintiff does not address its "violation of law" theory in its opposition/reply.

Even assuming, *arguendo*, Plaintiff has standing, its motion for summary judgment that Federal Defendants violated NEPA and the APA for failing to consider whether the 2011 management measures "violated" any provision of state or federal law applicable to the salmon doubling goal is DENIED; Federal Defendant's cross motion is GRANTED.[12]

### 3.   Range of Alternatives.

Plaintiff argues that the EA violated NEPA because it failed to analyze a reasonable range of alternatives to the 2011 management measures.  NEPA mandates that federal agencies "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  This requirement applies whether an agency is preparing an EIS or an EA, and requires the agency to give full and meaningful consideration

---

[12] For the first time in reply, *see* Doc. 84 at 6, Plaintiff argues that NMFS failed to comply with NEPA's requirement that it consider "whether the action is related to other actions with individual insignificant but cumulatively significant impacts."  40 C.F.R. § 1508.27(b)(7).  Plaintiff then cites a number of other "efforts in California to preserve and restore natural SJRFC," including VAMP, restoration programs implemented under CALFED and CVIPA, and NMFS's 2009 OCAP Salmonid Biological Opinion.  This argument will not be considered, as it was raised for the first time in reply.  Even if it were properly before the Court, Plaintiff entirely fails to explain how the cited NEPA regulatory provision is triggered by the existence of these "other efforts" to protect salmon.  A cumulative impact is an "impact on the environment which results from the incremental impact of the action when added to other ... reasonably foreseeable future actions...."  40 C.F.R. § 1508.7.  Plaintiff provides no evidence that the 2011 management measures cause incremental impact when added to other reasonably foreseeable future actions.

to all reasonable alternatives.  *N. Idaho Cmty. Action Network v.*

*U.S. DOT*, 545 F.3d 1147, 1153 (9th Cir. 2008).  However, "an agency's

obligation to consider alternatives under an EA is a lesser one than

under an EIS."  *Id.* (citation omitted).  In preparing an EIS, an

agency is required to "[r]igorously explore and objectively evaluate

all reasonable alternatives," *see* 40 C.F.R. § 1502.14(a); for an EA,

an agency is only required to include "brief discussions of the need

for the proposal, [and] of alternatives as required by section

102(2)(E)...."  40 C.F.R. § 1508.9(b).  The available reasonable

alternatives are dictated by the underlying purpose of the proposed

action.  *See City of Carmel-by-the-Sea v. U.S. Dept. of Transp.*, 123

F.3d 1142, 1155 (9th Cir. 1997).  The court "reviews an agency's

range of alternatives under a 'rule of reason' standard that requires

an agency to set forth only those alternatives necessary to permit a

reasoned choice."  *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d

1153, 1160 (9th Cir. 1998).  In judging whether an agency considered

appropriate and reasonable alternatives, a court should focus on the

projects' stated purpose.  *Native Ecosystems Council v. U.S. Forest*

*Service*, 428 F.3d 1233, 1246 (9th Cir. 2005).

> Under NEPA, an agency's consideration of alternatives is
> sufficient if it considers an appropriate range of
> alternatives, even if it does not consider every available
> alternative. An agency need not, therefore, discuss
> alternatives similar to alternatives actually considered,
> or alternatives which are infeasible, ineffective, or
> inconsistent with the basic policy objectives for the
> management of the area...

*N. Alaska Env'l Center v. Kempthorne*, 457 F.3d 969, 978 (9th Cir.

2006) (internal citations and quotations omitted).

Here, Plaintiff claims that the four alternatives considered were "virtually identical, because, despite concerns raised regarding scientific uncertainty and upward bias in the forecast, all of the alternatives were based on a projected abundance of 729,893[, and] [n]one [was] premised on the possibility that projected SRFC escapement could be lower than 729,893, let alone as low as 231,671, the acknowledged lower bound of the 95 percent confidence interval." Doc. 59 at 23. Plaintiff argues that "given the recent population crash and concerns about upward bias and scientific uncertainty ... an alternative based on a lower abundance forecast and/or with more restrictive management measures would have been reasonable in order to inform decision-making and public participation as to the potential impacts of more conservative management measures, as well as evaluate different methods of achieving the goal of obtaining optimum yield on a continuing basis." *Id*.

The record establishes that NMFS considered scientific uncertainty and the potential for an upward bias and that the 2011 management measures already appropriately accounted for these factors. Plaintiff offers no legal or scientific basis for requiring NMFS to construct alternatives utilizing abundance estimates outside the 95% confidence interval generated by the SI model, which NMFS reasonably found to be the best available science. Plaintiff provides no expert opinion that the science utilized does not meet

the required standard.

Plaintiff apparently challenges the fact that SRFC escapement estimates were similar among all the alternatives that were considered.  The 2011 management measures and the alternatives evaluated in the EA constrain fishing by, among other things, controlling the timing of the fishing season, the methods and gear used by fishermen, and the imposition of size and catch limits.  *See generally*, Preseason Report II, AR 5183-5249.  Because the abundance of SRFC was predicted to be surplus to the conservation objective[13], NMFS determined that other fish stocks, not SRFC, would constrain the fishing season this year.  *See* AR 810.  The alternatives explored various management measures that would create material differences in the impact to those other, constraining fish stocks.  The purpose of the 2011 management measures is is to "allow fisheries to harvest surplus production of healthy natural and hatchery salmon stocks," AR 4993, and to implement the FMP, which is designed to achieve the optimum yield from the fishery.  *See* 16 U.S.C. § 1802(33).  Given that the purpose of the action is to permit harvest of salmon under the management scheme set forth in the MSA, NMFS did not need to include SRFC harvest alternatives that needlessly constrained SRFC harvest.  Instead, the range of alternatives was structured to highlight alternative management approaches for the stocks that would

---

[13] The conservation objective is a goal set by previous regulation, not by the 2011 management measures.  Plaintiffs do not here challenge the conservation objective. They cannot reasonably object that the alternatives were structured to reflect the fact that SRFC was predicted to exceed the conservation objective.

constrain the fishery.  This does not violate the "rule of reason,"
as the additional alternatives demanded by Plaintiff were not
necessary to permit a reasoned choice.

Assuming, *arguendo*, Plaintiff has standing, its motion for
summary judgment that Federal Defendants violated NEPA and the APA by
failing to identify a reasonable range of alternatives is DENIED;
Federal Defendants' cross-motion is GRANTED.

## V. CONCLUSION

This is a case where the agency "got it right" and followed the
law.  For the reasons set forth above:

(1) Defendant PFMC and the Doe Defendants are DISMISSED WITH
PREJUDICE; and

(2) Federal Defendants', Delta Intervenors', and PCFFA's motions
for summary judgment that Plaintiff lacks standing are GRANTED;
Plaintiff's cross motion is DENIED.

(3) Assuming, *arguendo*, Plaintiff has standing:

(a) Plaintiff's motion for summary judgment that Federal
Defendants violated the MSA and APA by failing to account for
uncertainty and bias is DENIED; Federal Defendants' cross motion
is GRANTED;

(b) Plaintiff's motion for summary judgment that Federal
Defendants violated the MSA and APA by ending the overfishing
concern is DENIED; Federal Defendants' cross motion is GRANTED;

(c) Plaintiff's motion for summary judgment that Federal

59

Defendants violated NEPA and the APA by failing consider whether the 2011 management measures would "violate" any federal, state or local laws or other requirements imposed to protect the environment is DENIED; Federal Defendants' cross motion is GRANTED; and

       (d) Plaintiff's motion for summary judgment that Federal Defendants violated NEPA and the APA by failing consider a reasonable range of alternatives in the EA for the 2011 management measures is DENIED; Federal Defendants' cross motion is GRANTED.

A separate form of order adjudicating these dispositive motions shall be issued by the Court.

SO ORDERED
Dated:   September 30, 2011

                                 /s/ Oliver W. Wanger
                             United States District Judge